### AMERICAN FUR REFINING CO. et al. v. CIMIOTTI UNHAIRING MACH. CO. et al.

(Circuit Court of Appeals, Third Circuit.   July 3, 1903.)

#### No. 39.

1. PATENTS—INFRINGEMENT—MACHINE FOR PLUCKING FURS.

The Sutton patent, No. 383,258, for a machine for plucking furs, claim 8, construed, and *held* not infringed by a machine built on the general principles shown in the Lake English patent, with a reciprocating instead of a fixed stretcher bar, and having no stationary card, such as constitutes one of the elements of the combination of the claim.

Appeal from the Circuit Court of the United States for the District of New Jersey.

For opinion below, see 120 Fed. 672.

Henry Schreiter, for appellants.

Louis C. Raegener, for appellees.

Before ACHESON and DALLAS, Circuit Judges, and BUFFINGTON, District Judge.

BUFFINGTON, District Judge.   This is an appeal from a decree entered in the United States Circuit Court for the District of New Jersey against the American Fur Refining Company, appellant, alleging infringement of the eighth claim of patent No. 383,258, granted May 22, 1888, to John W. Sutton, for a machine for plucking furs. The validity of the patent was sustained in Cimiotti Unhairing Company et al. v. Bowsky (C. C.) 95 Fed. 474, a case heard in the Second Circuit, and is not here questioned, the sole issue being alleged infringement.   The invention relates to "an improved machine for plucking seal skins and other furs so as to remove the stiff water hairs therefrom without injuring the soft hair or wool of the same." Scattered among the fur on the pelt of such animals are found stiff, resilient hairs, termed "water hairs," which it is necessary to pluck or cut off.   This, before 1881, was done by hand.   Over the index finger, which it will be noted corresponds to the stretcher bar of the latter art, the operator stretched a section of the pelt.   By the mouth the fur was then blown down and retained in place by the thumb and finger, a depressing and repressing effect, which corresponds to the separating and holding devices shown later.   The toughness and resiliency of the water hairs caused them to stand upright.   They were then cut or plucked by shears or tweezers.   Hand-plucking was a laborious and expensive process, a girl taking a week to unhair a single seal pelt.   The first advance in machine unhairing of such skins was made by Gustav and Ferdinand Cimiotti, who subsequently

incorporated their interests in the appellee company. Briefly stated, their device, as shown in their patent of 1881, consisted of a knife-edged stretcher bar, a bellows which parted the fur and water hair, depressing the former and suffering the latter to stand out at the stretcher bar edge, a mechanism which simultaneously moved up guard combs to hold down the fur, and shears, brought to and operating at the stretcher bar edge, to cut the standing water hairs. By this machine an operator was enabled to unhair eight seal pelts in a day. It was highly successful, and as a seal unhairing device has never been supplanted. In 1883 another air-blast plucking machine was invented by one Rasmus. Its value was such that it was purchased by the Cimiottis, who, in 1884, licensed the firm of Bates & Co., of Boston, thereunder, and have collected royalty to the extent of several thousand dollars per year. These two machines practically monopolized, since that time, the unhairing of seal skins in the United States. In 1888 Sutton sought by the patent in suit to improve on air-blast machines. His device, as stated in his patent, was "more especially designed with a view to overcome some of the defects and insufficiencies of the plucking machines heretofore in use." These defects related to a particular part of the operation, as he desired to "produce the plucking of the skins at the lower part of the neck and shoulders, where the hairs pointed outwardly and backwardly, and are the most difficult to pluck, as they lie close to the skin when the same is drawn over the stretcher bar," and "to dispense with a blast fan or other air forcing devices, and produce the removing of the water hairs entirely by mechanical means which are operated by power, so that a quick and uniform plucking of the skin takes place." It will be particularly noted that the expressed special purpose of his invention was to clip the outwardly pointing hairs at the lower side of the neck. Sutton's invention is best stated in his own words:

"The invention consists of a machine for plucking seal and other skins, which comprises a fixed stretcher bar, means for stretching and intermittently feeding the skin over the said stretcher bar, a fixed card above the stretcher bar near the edge of the same, a rotary separating brush that is intermittently moved up in front of the stretcher bar, a rotary cutting knife and a vertically reciprocating cutting knife working in conjunction with the rotary knife for cutting off the stiff projecting hairs, said rotary cutting knife being provided with a card supported back of the knife; all of which parts are operated from a common driving shaft, so as to produce for each rotation of the same the cutting off or plucking of the hairs projecting from that part of the skin in front of the stretcher bar. * * * The invention consists, further, of the mechanisms by which the motion is imparted from the driving shaft to the different parts comprising the machine, as will appear more fully hereinafter, and finally be pointed out in the claims."

The eighth claim of the patent, which is here in issue, is as follows:

"The combination of a fixed stretcher bar, means for intermittently feeding the skin over the same, a stationary card above the stretcher bar, a rotary separating brush below the same, and mechanism substantially as described, whereby the rotary brush is moved upward and forward into a position in front of the stretcher bar, substantially as set forth."

It will be noted that other claims of the patent were for combination or working machine embodying all the effective elements, and that the eighth claim embodies only certain particular features. Analysis

of the claim shows that every element is specifically described in the patent specification, and the functional purpose thereof distinctly stated. We have first a fixed stretcher bar. This fixed stretcher bar is the center toward which all the movable operative elements of the machine converge. The specification says:

"On the frame, A, is supported a fixed, transverse stretcher bar, B, which is tapered to a narrow edge, over which the skin to be plucked is stretched. The skin is applied by tapes to the rollers, B', B', which are intermittently actuated by gear wheels operated by a pawl and rachet wheel mechanism from the driving shaft, S, as customary in plucking machines of this class. By the gear wheels and pawl and rachet mechanism the skin is fed intermittently for a small portion of its length over the front edge of the stretcher bar, it being unwound from the upper and wound up on the lower feed roller."

It thus appears not only that the stretcher bar was fixed, and therefore incapable of effecting the forward movement of the pelt, but that such forward pelt movement was effected direct from the driving shaft by means independent of the stretcher bar.

The next element of the claim is a stationary card above the stretcher bar. The function and use of this stationary card are shown in the specification:

"Immediately above the stretcher bar, B, is arranged a stationary card, E, which is attached to the ends of the stretcher bar, B, by means of thumb screws. (Not shown in the drawings.) The points of the teeth of the card, E, are close to, but do not touch, the surface of the skin, so that the hair and skin are both straightened as the skin is fed forward. The teeth of the card, E, hold down the fine fur, but permit the stiff hairs to stand up between the teeth, owing to the slow forward movement of the skin, which gives the hairs sufficient time to so adjust themselves."

Not only is the card's function thus stated, but to it is attributed, in combination, the effectiveness of the device. Says the patentee:

"The operation of the machine is quick and reliable, the hair being cut off close to the skin, and without injury to the fur, which is held back so as not to be presented to the knives by the action of the stationary card above and the joint action of the separating brush and oscillating guard below the stretcher bar."

It therefore appears that the teeth of the card effected a preparatory functional operation, and the card's importance may be estimated by the fact that it is an element in nine of the eleven claims. The other elements of this claim are a rotary separating brush below the stretcher bar (the brush being necessarily movable), and "a mechanism, substantially as described, whereby the brush is moved upward and forward in front of the stretcher bar."

The proofs show that Sutton's machine had no effect on the seal unhairing art, and is practically not used therein. An exclusive license thereto was acquired by the Cimiottis, but the machine's use was confined to some experimental work. It was never used commercially for the unhairing of seals. Gustav Cimiotti testified: "I never unhaired any seal skins commercially on the Sutton machine. Most of the skins that were unhaired on the Sutton machine were done day by day in an experimental way." Indeed, he goes to the length of saying it was not adapted to unhairing seal skins. His testimony in a former case embodied in this record is explicit: "Q. The

machine built in accordance with the Sutton patent here in suit is not at all adapted to unhair seal skins, is it? A. No, sir." He further testified that the Cimiottis were unhairing from 80,000 to 90,000 seal skins a year, and that they were all unhaired on the Cimiotti air-blast machines, "except a few, which were unhaired on the Sutton machine." The rapid operation of a machine of Sutton's type, as compared with one of the Cimiotti air-blast design, and the gain in output and economy of operation in the former, if it could be successfully used to unhair seal pelts, is apparent. That it could not and has not been practically and commercially used for the unhairing of seals, for which it was invented, because it could not do it safely, is strongly suggested, if not, indeed, proven, by the cautious statement of Mr. Cimiotti. A seal skin is worth approximately $50. A slip, therefore, in a rapidly working power machine means ruin to such a pelt. Mr. Cimiotti testifies: "The only difficulty in unhairing seals on a power machine is that it is more dangerous—that, if some wool should spring out occasionally, you cannot stop it quick enough to prevent damage to the wool—and therefore a hand machine is preferable as the man has it more under control all the time." This criticism of a power machine is in line with the testimony of Shaw, who was interested in a machine for unhairing seal skins, constructed under the Lake English patent of 1881. In answer to the question, "What was the trouble with the machine or with the business that induced you to abandon the invention?" Mr. Shaw testified: "The machine was not accurate enough. It would cut the stiff hairs, and the next minute it would cut a hole in the skin. I saw one skin that I paid $50 for ruined in one second." Whatever the reason, the fact is unquestioned that the machine of Sutton had no effect on the particular art to which it was addressed, and after its purchase by the Cimiotti firm it remained in disuse for a period of two years, although they were then unhairing from 80,000 to 90,000 seal skins a year, and, if it was adapted to that work, they could have used it presumably with much profit. Had commercial conditions so continued, there would have been no pretense for any expansive construction of the claims of this patent. In this condition of disuse the commercial development of what is called the "coney" or "rabbit skin" industry made possible the adaptation of the Sutton machine, or a modification thereof, to that character of work. The value of the Sutton machine therein was wholly an afterthought and incidental. When the possibility of unhairing and dyeing a rabbit skin so as to resemble a seal, and selling it under the name of "Electric Seal," was demonstrated, the disused Sutton machine was brought out by the complainants, and adapted to their work. The proofs show that the complainants began unhairing the rabbit skins in 1890. This was first done on the air-blast machines. Their operation was not rapid enough, and attention naturally turned to the unused Sutton machine. Gustav Cimiotti says: "When the coney industry came into the market, we naturally thought that the Sutton machine, being an automatic machine, would be better adapted, and we merely made experiments with coneys, and found it satisfactory, upon which an order was given for a number of them for coneys." A slip in the operation of a Sut-

ton machine, which was prohibitive in the case of seals, was a matter of comparative indifference in unhairing coney skins, which were worth, approximately, $6 a dozen. Cimiotti admits the machines were not built according to the drawings. "Well, they are not exactly according to the drawings. There were some changes made in the course of experimenting on them, and we made some changes in the mechanical details, but the original principles of the patent were adhered to." Sutton, one of the complainants, in 1895 took out a patent for improvements on the machine of the patent in suit, which improvements are embodied in the machine now used by the complainants. This 1895 patent states that it relates to improvements over No. 383,258, the patent in suit, said improvements "being designed with a view to overcoming some of the defects of the machine referred to." What these defects were, Sutton, the complainant, was not called to show. The later patent discarded the stationary card to which we have referred, and substituted a second rotary brush therefor.

The coney industry has led to the adoption by the defendants of the alleged infringing machine, which, in its movable, oscillating stretcher bar, follows the general line shown in the Lake English patent, which, as we have seen by the statements of complainants' witness Shaw, was also not accurate or adapted to unhairing seals. Whatever may have been the defects of that machine when applied to the costly experimental work of unhairing seal skins, it is clear to us that its general principles were such that a mechanical adaptation of them so as to successfully deal with the cheap rabbit skins of the coney industry was quite as possible as the adaptation of Sutton's unused seal unhairing machine to the later industry; and in that adaptation we are clearly of opinion the respondents have not embodied the elements designated in the eighth claim of the Sutton patent. The essential and central feature of respondents' construction—that around which all its mechanism centers—is its movable stretcher bar. Such a reciprocating stretcher bar, actuated by the same general mechanism, was shown in the Lake patent. This reciprocating movement carried the pelt in the respondents' machine from the brush to the shears, and it feeds the pelt forward over the stretcher edge as well. Its single reciprocating movement covers approximately a quarter revolution of the power shaft. The three separate mechanisms of Sutton for moving the brush to the stretcher bar, the shears to the same point, and feeding the pelt forward, are, so to speak, unified in the respondents' single oscillating motion of the stretcher bar, which substantially modifies or effects all three. It is evident that this is not a mere reversal of parts or principles, mere transposition or substitution, but is, in substance, the embodiment of a single threefold effective movement in lieu of the work of three different individual mechanisms. But that is not all. The respondents have found means to unhair pelts by the total omission of the stationary card with its teeth and preparatory work, an essential element of Sutton's eighth claim. The fur and hair are neither straightened, separated, nor subjected to any such preparatory card work in the respondents' device. They use a repression bar of the same

general type shown in the repressing blade of the Covert patent of 1884 and the compression plate of the Lake English patent of 1881. That the two machines of respondents and complainants both accomplish the same result may be conceded, but identity of result is not the test of infringement. There must in the ordinary patent be identity of means and identity of operation as well. Kokomo Fence Co. v. Kitselmans, 103 O. G. 1422, 23 Sup. Ct. 521. In the means employed by respondent we find an absence of the specific elements of the claim in suit. The respondents have no fixed stretcher bar. They have no means for intermittently feeding the skin over such a fixed stretcher bar. They have no stationary card above the stretcher bar. They have no movable separating brush below such stretcher bar, and no mechanism whereby a rotary brush is moved upward and forward in front of such stretcher bar. This shows a nonidentity of means, and it is fundamental law that the nonuse of any specific element of a combination claim or its equivalent avoids infringement. Water-Meter Co. v. Desper, 101 U. S. 332, 25 L. Ed. 1024; Weatherhead v. Coupe, 147 U. S. 322, 13 Sup. Ct. 312, 37 L. Ed. 188; Wright v. Yuengling, 155 U. S. 47, 15 Sup. Ct. 1, 39 L. Ed. 64. The difference between the fixed stretcher bar and the rotary brush of Sutton and the rotary brush and movable stretcher bar of the respondents, is not the mere reversal of relations the words indicate. By that change the two separate movements of both shears and brush to the Sutton stretcher bar and the separate independent mechanical means for accomplishing the two are replaced by the oscillating movement of the stretcher bar. Nor is this all. The upward and forward movement of Sutton's brush is not translated or reversed into an upward and forward movement of respondents' stretcher bar, but it is substantially done away with in the rocking of the stretcher bar; and that movement also effects an additional result, viz., the forward feeding of the pelt, which in Sutton was done by independent means, and which means he makes an element of his claim. It is therefore apparent that the single reciprocating movement of the stretcher bar, which in itself was shown years before in the Lake patent, is not a mere mechanical transposition or subterfuge, but embodies the use of substantially different mechanical principles, movements, and means in a wholly different way. When these different principles result—as they do in this case—in a double working capacity and product, the conclusion that there is a difference between the two machines in substance as well as form is apparent.

We deem it proper to say that the decisions in the Second Circuit involving this patent have been carefully considered. We do not understand that a machine such as is here in question was involved in those cases, or has ever been passed upon. If, however, the construction there given this claim be so broad as to cover the respondents' device, we cannot, in view of what we have said above, accede to such view.

Finding, as we do, that infringement has not been shown, the decree of the court is reversed, with instructions to dismiss the bill for noninfringement, with costs.